**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| COMPASSUS OP OF MISSOURI LLC d/b/a COMPASSUS HOSPICE AND PALLIATIVE CARE-ST LOUIS<br><br>Plaintiff,<br><br>v.<br><br>ALEX M. AZAR II, in his official capacity as Secretary of the United States Department of Health and Human Services<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) No. Case No. 4:18-cv-1942<br>)<br>) **JURY TRIAL DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>) |

**COMPLAINT SEEKING TEMPORARY RESTRAINING ORDER, PRELIMINARY
INJUNCTIVE RELIEF AND DECLARATORY RELIEF**

Compassus OP of Missouri LLC d/b/a Compassus Hospice and Palliative Care-St Louis ("Compassus Hospice"), by and through its attorneys, for its Complaint, states:

### I.   INTRODUCTION

1.   This is a civil action for a temporary restraining order, preliminary injunction, and permanent injunction to stop Defendant from terminating Compassus Hospice's Medicare provider agreement.  Termination would prevent terminally ill Medicare beneficiaries from continuing to receive end of life care from Compassus Hospice.  Absent intervention by this Court, termination will occur on November 22.  Even a temporary termination of Compassus Hospice's Medicare provider agreement would require Compassus Hospice to close its doors, lay off its employees, and transfer the care of its terminally ill patients receiving end-of-life to another

hospice, causing severe and irreparable harm to Compassus Hospice, its patients, and the patients' families.  All of this disruption would occur during what will likely be the last holiday season of many hospice patients' lives.  Subsequent restoration of Compassus Hospice's Medicare Program provider agreement following a successful administrative appeal could not remedy this irreparable harm.  Although the administrative appeal process is not complete, denying injunctive relief under these circumstances would, in effect, totally deny Compassus Hospice judicial review.

## II.     PARTIES

2.      Plaintiff Compassus Hospice is a Medicare certified hospice program with facilities in St. Louis, Missouri and Washington, Missouri serving patients and their families in Franklin, Jefferson, Lincoln, St. Charles, St. Louis, Warren, Pike, Montgomery, Gasconade, Crawford, and Washington Counties and St. Louis City.   It is a Delaware limited liability company.

3.      Compassus Hospice participates in the Medicare Program pursuant to a provider agreement with the Department of Health and Human Services' Centers for Medicare and Medicaid Services ("CMS") and applicable federal statutes and regulations.

4.      Defendant Alex M. Azar II (the "Secretary") is the Secretary of the United States Department of Health and Human Services ("HHS"), an agency of the United States government, and is responsible for administering the Medicare Program.  CMS is the operating component of HHS charged with administration of Medicare.  The Secretary is sued in his official capacity.

## III.    JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g), 28 U.S.C. § 1331, and 28 U.S.C. § 1651.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (e) and 5 U.S.C. § 703.

## IV.     STATUTORY AND REGULATORY BACKGROUND

7. The Medicare Program is a federal health insurance program, in which the federal government reimburses health care providers, including hospices, for the treatment and care they provide to beneficiaries, including the elderly.

8. Hospices—such as Compassus Hospice—that "participate" in the Medicare Program must be certified for such "participation" pursuant to federal regulations set forth in 24 C.F.R. 418, *et seq*. A hospice that wishes to participate in the Medicare Program is required to enter into a written "provider agreement" with the Secretary.

### The Medicare Survey Process

9. Hospices participating in Medicare are required to meet certain requirements, referred to as "Conditions of Participation," 42 C.F.R. 418, *et seq.*

10. CMS is charged with overseeing and enforcing the laws and regulations pertaining to the federal government's Medicare Program. CMS and its Quality, Safety and Oversight Group oversees care providers' continuing compliance with "Conditions of Participation" through the use of surveys, which are conducted on behalf of CMS by state survey agencies.

11. State survey agencies are required to conduct surveys in accordance with the methods, procedures and forms prescribed by the Secretary.

12. In Missouri, the state licensure agency that conducts the surveys is the Missouri Department of Health and Senior Services.

13. For hospices seeking to participate in Medicare, the State Survey Agency conducts initial surveys and recommends to CMS whether the hospice should be certified. CMS makes a determination on behalf of the Secretary. Additional surveys are conducted periodically to ensure that certified hospices continue to comply with the Conditions of Participation.

14. The Secretary has published regulations governing the survey process. These regulations provide that a hospice is not or is no longer in compliance with the conditions of participation or conditions for coverage where the deficiencies are of such character as to substantially limit the [hospice's] capacity to furnish adequate care or which adversely affect the health and safety of patients." 42 C.F.R. § 488.24(b); *see also* 42 C.F.R. § 488.1 (defining "provider" to include a hospice).

15. 42 C.F.R. § 488.11 authorizes state survey agencies to perform surveys and certify their findings to CMS and, per 42 C.F.R. § 488.20 to evaluate reports that may pertain to the health and safety of patients.

16. The State Survey Agency must ensure that an agency's actual provision of care and services to patients and the effects of that care are assessed in a systematic manner; such assessment must be based on the needs and outcomes of patients. 42 C.F.R. § 488.26(e).

17. If the State Survey Agency finds that the program is not in compliance with a regulatory requirement for participation in the Medicare Program, the agency is required to report that "deficiency" to the provider in writing in a "Statement of Deficiencies" pursuant to CMS-issued guidelines, the State Operations Manual ("SOM") § 2728.

18. There are two types of deficiencies: (a) "standard" level violations, which do not result in a termination action; and (b) "condition" level violations, which cause the provider to be placed on a "Track" to be terminated from the Medicare Program. Normally, if a "condition" level violation is found, the hospice is given 90 days to correct the deficiency before termination becomes effective. If a survey determines the violation creates "immediate jeopardy" to patient safety, the provider is placed on a 23 day "fast track" termination track. No regulation expressly permits hospices (unlike nursing facilities) to be placed on a 23-day fast track termination track.

19. The Secretary may terminate a hospice's certification and its participation in Medicare after the Secretary has provided "reasonable notice to the provider and the Public" and determined that the provider "fails to comply substantially . . . with the provisions of [subchapter XVIII] and the regulations thereunder." 42 U.S.C. § 1395cc(b)(2)(A).

20. The survey procedures provide for possible termination of a provider agreement only where there is a "failure to substantially meet one or more Conditions" (where "substantially" is defined as meeting the applicable Conditions of Participation) or where there is a violation that poses "Immediate Jeopardy" to patient health or safety. SOM §§ 3010 and 3012.

21. "Immediate Jeopardy" is defined in SOM § 3010 as "a crisis situation in which the health and safety of patients is at risk." Immediate jeopardy termination authority is limited to immediate and serious crisis situations. Surveyors must determine that the threat is "present when [they] are onsite and must be of such magnitude as to seriously jeopardize a patient's health and safety [and] there should be no other application of immediate jeopardy terminations." *Id*.

### The Enforcement Process

22. When the Secretary decides to terminate a facility's Medicare Program participation, state survey agencies carry out the termination following procedures set forth in the SOM. 42 C.F.R. § 488.456.

23. A provider that is terminated from the Medicare Program has a right to appeal the termination decision and present its case in a hearing before a federal administrative law judge. 42 C.F.R. Part 498.

24. The scope of the administrative appeal is limited to the particular findings of non-compliance. The judge cannot review the remedy imposed—*i.e.*, the Secretary's decision to terminate the hospice rather than impose a less severe remedy—because of the noncompliance.

25.     The administrative law judge does not have the authority to stay the termination while the appeal is pending.  Termination may go into effect 15 days from the issuance of notice by CMS.

26.     As a practical matter, an appeal hearing (much less a decision) will not occur until after the provider's termination from the Medicare Program has taken effect, and the provider's patients have been discharged and transferred.

## V.     FACTUAL BACKGROUND

27.     Compassus Hospice has been a provider under the Medicare program for eleven (11) years.

28.     Compassus Hospice has been an approved provider under the Medicare Program since May 30, 2007.  The most recent survey conducted before the events giving rise to this suit (a survey conducted in October 2015) found Compassus Hospice to be void of deficiencies.

29.     The action by CMS in this case stems from surveys of Compassus Hospice conducted by the Missouri Department of Health and Senior Services, a Missouri state survey agency, acting on behalf of CMS.

30.     On September 28, 2018, the state agency conducted a survey pursuant to a complaint investigation.  A survey report issued by CMS finds that one condition level deficiency was identified at an Immediate Jeopardy level, related to 42 C.F.R. § 418.64 Condition of Participation: Core Services.  (Ex. A, CMS Form 2567, p. 1.)  The Secretary would not indicate the source of the complaint that led to the survey. 42 C.F.R. § 418.64 relates to a Condition of Participation that "a hospice must routinely provide substantially all core services directly by hospice employees.  These services must be provided in a manner consistent with acceptable standards of practice."

6

31. Compassus Hospice addressed the findings of the state agency in order to abate the immediate jeopardy determination through a plan of correction.

32. A follow-up survey and an extended survey were completed on October 26, 2018 as a consequence of the alleged immediate jeopardy findings. CMS determined on the same date that the Immediate Jeopardy was not abated.

33. On November 6, 2018 CMS sent Compassus Hospice a "Final Notice: Medicare Termination," informing Compassus Hospice (1) that its provider agreement would be terminated on Thanksgiving, November 22, 2018; and (2) that Compassus Hospice would not be permitted to take new Medicare patients on or after that date. Additionally, payments for any Medicare patients enrolled prior to that date would cease 30 days subsequently, on December 22, 2018. As a practical matter, this would result in a closure of Compassus Hospice. While Compassus Hospice would be able to continue to serve private-pay patients, there is not an adequate volume of private-pay patients for Compassus Hospice to continue operations.

34. Specifically, the Secretary seeks to terminate Compassus Hospice's Medicare provider agreement on the basis an Immediate Jeopardy finding related to care associated with two hospice patients, identified by the state agency as Patient 1 and Patient 3. Compassus Hospice had 88 patients at the time of the survey. CMS asserts that Compassus Hospice is in violation of 42 C.F.R. § 418.64 for "fail[ing] to ensure the nursing needs of the patient were met (L591)." (Ex. A, p. 2.)

35. To support its Immediate Jeopardy finding, CMS asserted that Compassus Hospice failed to appropriately monitor and asses Patient 1 for wounds upon admission, and that Compassus Hospice failed to adequately coordinate the pain management of Patient 3, a terminally ill patient suffering from esophageal cancer with metastasis to the bone and liver. In addition,

CMS further asserts condition level violations on the basis that Compassus Hospice failed to take into account the full dietary needs of Patient 3 and failed to provide adequate bereavement care for a third patient, Patient 10.

36.     These findings are factually inaccurate and omit or overlook critical information about these patients' care.  In addition, these findings, even if true, are such a limited nature that they do not imply a systemic issue at Compassus Hospice.  As such, the findings do not support an Immediate Jeopardy sanction.

37.     With respect to Patient 1, CMS asserts that Compassus Hospice failed to provide appropriate wound care service over an 11-day period.  CMS found that upon admission on October 4, Patient 1 had a coccyx wound measuring 0.3 cm x 0.3 cm x 0 cm.  Patient 1 was visited by a nurse five times over the next two weeks, and on October 18, 2018 the hospice nurse noted the wound had increased to 1 cm x 0.5 cm x 0 cm.  CMS's alleges that Compassus Hospice failed to assess the wound between October 4 and October 18.  This is wrong.

38.     CMS ignores the nurse's specific documentation that the "wound was assessed" during the intervening visits.  Upon identifying that the wound had begun to expand on October 18, 2018, the nurse implemented wound treatment procedures.  The records reflect good medical care in the observation minor wounds, and reflective of standard practice for hospice services.

39.     CMS's allegation that Compassus Hospice did not appropriately address a worsening wound is inconsistent with clinical guidance.  Wounds of the size initially present on this patient are not typically treated upon admission but generally resolve themselves. When the hospice nurse identified that this wound was not resolving but was instead expanding, she appropriately implemented wound care treatment.

40. CMS's conclusion that this instance was a material failure of care and represented "immediate jeopardy" situation is wrong. That assertion also takes clinical judgment away from the licensed medical professionals rendering services to the terminally ill patient and fails to account for a patient's personal desires to receive comfort care. Nor has CMS established any pattern or practice to suggest that Compassus Hospice was routinely inadequate in wound care—CMS relies entirely on one wound, the size of a pencil eraser, on a single patient, to whom wound care assessment was provided.

41. With respect to Patient 3, CMS asserts that Compassus Hospice failed to provide adequate pain management services. Patient 3 indicated a high level of pain over the course of several months. CMS's finding is based on the difference between Patient 3's reported pain level and stated pain goals:

- On July 19, 2018, Patient 3 rated his/her pain at a "8," and stated a pain goal of "2."

- On July 26, 2018, Patient 3 rated his/her pain at a "7," and stated a pain goal of "4."

- On July 30, 2018, Patient 3 rated his/her pain at a "9," and stated a pain goal of "5."

- On August 2, 2018, Patient 3 rated his/her pain at a "7."

- On August 9, 2018 Patient 3 rated his/her pain at a "6."

- On August 13, 2018 Patient 3 rated his/her pain at a "8."

- On August 30, 2018 Patient 3 rated his/her pain at a "7."

- On September 10, 2018 Patient 3 rated his/her pain at a "7," and stated a pain goal of "6."

- On September 27, 2018 Patient 3 rated his/her pain at a "6," and stated a pain goal of "6."

- On October 11, 2018 Patient 3 rated his/her pain at a "7," and stated a pain goal of "6."

9

- On October 17, 2018 Patient 3 rated his/her pain at a "6," and stated a pain goal of "5."

42. These subjective numbers do not tell a complete story of Patient 3's pain management and fail to accurately account for Patient 3's treatment goals, which included a desire to remain cognizant and active instead of lethargic and inert.

43. Had the surveyor adequately investigated the immediate jeopardy issues, the surveyor would have learned that Patient 3 has experienced severe pain since an accident in 2003, well before he became terminal. Following this accident, the patient went on disability and sought treatment for his pain.

44. Prior to entering the care of Compassus Hospice, Patient 3 reports he/she was constantly in a high level of pain, and that his/her prior cancer care did not adequately managed his/her pain.

45. After a history of poor pain management by prior providers, Patient 3 developed a habit of reporting pain in the range of 7 to 9 as a means of expressing his/her general dissatisfaction with his circumstances. The reported pain level (an inherently subjective report) must be understood in light of this patient's practices and experience.

46. In fact, Patient 3 considers Compassus Hospice to be a "Godsend" for pain management.

47. Patient 3 currently receives more than 1,000 milligrams of morphine a day, in addition to other pain medications. Indeed, Patient 3 is provided with additional pain medicine that he/she elects not to take, as increased doses of pain medicine may compromise a patient's lucidity. Patient 3 has made the difficult choice to accept a certain amount of pain for the purpose of maintaining lucidity during end-of-life care.

48. CMS's finding the hospice "ran out" of pain medication for the patient is simply incorrect. Patient 3 lives in a skilled nursing facility that has its own pharmacy and medical director, separate and apart from the care he receives from visits by Compassus Hospice. There was never a situation in which Patient 3 did not have access to medication. His facility caregivers (i.e., the nurses and staff at the nursing facility) should have made medications available to him. Nursing facility staff alleges the hospice physician failed to timely prepare refill scripts, but this assertion is not true.

49. In addition, CMS found a condition level violation that Compassus Hospice did not appropriately provide for Patient 3's dietary needs. CMS basis this finding on the patient's stated difficulty eating solid foods as a result of esophageal cancer, and an initial assessment that the patient has nutritional problems. The records demonstrate that Compassus Hospice took appropriate steps in observing and assessing Patient 3's nutrition status, and consulting a dietician for the patient. Although the patient continued to lose weight, that is an expected outcome for a terminally ill patient.

50. If the Secretary terminates Compassus Hospices' Medicare provider agreement, Patient 3 (and many similarly situated patients) will lose access to the "Godsend" pain management and other effective care that Compassus Hospice has provided them.

51. CMS also included condition-level deficiencies related to bereavement services. Irrespective of the accuracy of CMS's findings, which Compassus Hospice disputes, these deficiencies—on their face—do not constitute Immediate Jeopardy. The deficiencies include practices such as failing to update the bereavement care plan and failing to make "appropriate" counselling visits (even after documentation of a refusal from the expired patient's family member). "Immediate jeopardy" means "a situation in which the provider's or supplier's non-

compliance with one or more requirements, conditions of participation, conditions for coverage, or conditions for certification has caused, or is likely to cause, serious injury, harm, impairment, or death *to a resident or patient*." 42 C.F.R. § 489.3. The family members of deceased patients are not "residents or patients" of the hospice. Any deficiencies in bereavement care planning necessarily cannot constitute Immediate Jeopardy.

52. Compassus Hospice is confident that it will succeed on an administrative appeal, given the opportunity to present all relevant facts for consideration. However, such a victory would be pyrrhic because termination will occur long before any administrative appeal can be completed. Immediate relief is thus necessary to preserve Compassus Hospice's rights.

## VI.  IRREPARABLE INJURY

53. The Secretary's termination of Compassus Hospice's participation in the Medicare Program, effective as of November 22, 2018, will, unless enjoined by this Court, cause irreparable injury to Plaintiff, for which Plaintiff has no adequate remedy at law in that:

   a. Plaintiff will be forced to close its hospice program given that nearly all terminally ill patients are elderly and Medicare beneficiaries; the hospice cannot survive by serving only the very small number of private-pay patients and will no longer be qualified as a Medicare provider;

   b. Plaintiff has already reduced the number of patients it is able to serve from 88 at the time of the survey to 60, based on the inability to admit new patients. All of its remaining patients are funded by Medicare.

   c. Even if Plaintiff is successful in its administrative appeal of the Secretary's order to terminate its provider agreement, Plaintiff will have been required to close its business out of economic necessity prior to such relief being granted.

54. The Secretary's termination of Compassus Hospice's participation in the Medicare program, effective as of November 22, 2018, will, unless enjoined by this Court, cause irreparable injury to Plaintiff's terminally ill patients and their families for which there is no adequate remedy at law in that:

   a. Patients, some of whom are actively dying and may be on their death beds, will be forced to transfer to another hospice provider where a completely new team of hospice staff, including physicians, nurses, hospice aides, social workers, chaplains, and therapists will need to become familiar with their terminal condition, families and living situation. Such involuntary transfer could result in physical and emotional harm to these end-of-life patients at the most vulnerable time of their lives;

   b. The patients' families will be harmed in that they will be forced to find placement for the terminally-ill loved one with a limited number of Medicare-qualified hospices, even after selecting Compassus Hospice as its preferred hospice. These other hospices may be ill-equipped or staffed to serve the needs of Compassus Hospice's 60 terminally ill patients.

55. The termination of Compassus Hospice's participation in the Medicare Program, effective as of November 22, 2018, will, unless enjoined by this Court, cause irreparable injury to Plaintiff's employees in that Plaintiff will be forced to terminate their 32 employees —including nurses, counselors, chaplains, bereavement coordinators, administrators, and more — in the period between Thanksgiving and Christmas.

56. Plaintiff's employees will not only be forced to search for new employment during the holidays, but these individuals will suffer reputational harms because of the termination of

Compassus Hospice's participation in the Medicare program—a termination that may be erroneously imputed to these employees' job performance and may particularly hinder their job search.

57. The Secretary will not incur harm from the temporary restraining order in that if the patients are transferred to another hospice, the Secretary will continue to pay such hospice reimbursement for their palliative care under Medicare and, indeed, may pay more money if additional physician or nurse practitioner visits are necessary to onboard new patients in a receiving hospice.

58. The public interest will not be disserved by the issuance of the temporary restraining order given that there is a compelling public interest in providing timely and uninterrupted palliative care by end-of-life patients' current hospice clinicians until after the Administrative Law Judge hearing.

## VII.   STATEMENT OF CLAIMS

### COUNT I

**(Violations of Compassus Hospice's Due Process Rights, U.S. Const. Amend. V)**

59. The allegations contained in paragraphs 1 through 58 herein above are incorporated by reference as if fully set out herein.

60. Compassus Hospice's Medicare provider agreement and continued participation in the program constitutes a valuable property right or liberty interest within the meaning of the Fifth Amendment to the United States Constitution.

61. The Secretary's termination process violates Plaintiff's right to due process. Given the magnitude of the deprivation that it will suffer through termination, Plaintiff is entitled to significantly greater pre-deprivation process, including full notice of the potential findings and penalties, the opportunity to be heard by and present arguments to a neutral tribunal, and the

opportunity for review of those findings and penalties. The post-deprivation process of an administrative appeal process is insufficient to constitute due process under the circumstances. Defendant's termination of Compassus Hospice's provider agreement and the cessation of Medicare reimbursement payments will irreversibly financially devastate Plaintiff before it has a chance to obtain remedy by challenging CMS's erroneous findings at an administrative hearing.

## COUNT II
### (Violations of Patients' Due Process Rights, U.S. Const. Amend. V)

62. The allegations contained in paragraphs 1 through 61 herein above are incorporated by reference as if fully set out herein.

63. Compassus Hospice's Medicare provider agreement and continued participation in the program constitutes a valuable property right for the patients of Compassus Hospice within the meaning of the Fifth Amendment to the United States Constitution. The hospice patients have a protected life and liberty interest in remaining with their current hospice interdisciplinary team of clinicians and pastoral care staff and not being involuntarily transferred during their end-of-life care, which may involve significant health and quality-of-life risks, with related trauma to the patients' families and home caregivers who must see their terminally ill family go through this trauma.

64. The Secretary's purported termination of Plaintiff's Medicare Program participation constitutes actions taken in violation of the patients' rights to due process of law under the Fifth Amendment of the United States Constitution because the purported termination will deprive such patients of continued end-of-life care through Compassus Hospice. Patients are entitled to significantly greater pre-deprivation process, including full notice of the potential findings and penalties, the opportunity to be heard by and present arguments to a neutral tribunal,

and the opportunity for review of those findings and penalties. The post-deprivation process of an administrative appeal process is insufficient to constitute due process under the circumstances.

65. Compassus Hospice may assert the due process rights of its patients. *Craig v. Boren*, 429 U.S. 190, 190 (1976).

## COUNT III
### (Arbitrary and Capricious Agency Action)

66. The allegations contained in paragraphs 1 through 65 herein above are incorporated by reference as if fully set out herein.

67. The Secretary's termination of the Medicare funding and the provider agreement constitutes an agency action that is: (1) in excess of his statutory authority; (2) without observance of procedure required by law; and (3) arbitrary, capricious and an abuse of discretion. 5 U.S.C. § 706(2).

## COUNT IV
### (Issuance of Preliminary Injunction and Permanent Injunction)

68. The allegations contained in paragraphs 1 through 67 herein above are incorporated by reference as if fully set out herein.

69. Defendant has scheduled to terminate Compassus Hospice's Medicare provider agreement on November 22, 2018, and informed Compassus Hospice that previously admitted patients' hospice care coverage will cease on December 22, 2018.

70. Defendant's actions have resulted in and will continue to represent irreparable harm to Compassus Hospice and its patients, the families of its patients, its employees, and the community as a whole.

71. Compassus Hospice will suffer irreparable harm by the termination of its Medicare provider agreement in that it is heavily dependent upon Medicare reimbursement for its revenue.

In fact, Compassus Hospice currently has no private pay patients. Accordingly, any termination of the Medicare provider agreement is tantamount to a forced closure for Compassus Hospice.

72. Compassus Hospice will be required to close its doors shortly after cessation of the Medicare Program, before Compassus Hospice has an opportunity to obtain relief through an administrative hearing.

73. In order to continue receiving end-of-life care during the holiday season, Compassus Hospice's Medicare-dependent patients and their families will be required to find other suitable St. Louis area hospices with Medicare provider agreements and may be unable to do so on short notice.

74. Continuity of treatment is an important principle of healthcare and rehabilitation services. Patients establish relationships with nurses and healthcare professionals that are essential to their care and treatment. Disruption of these relationships for existing patients would clearly cause harm that could not be repaired. The incalculable ripple effect that this would have across scores of families, not to mention the strain it would place on other local hospices, is not in the public interest.

75. Compassus Hospice's closure would not only cause severe and irreparable harm to itself and its patients but also to the 32 employees of Compassus Hospice who would lose their employment.

76. The certainty of irreparable harm to Compassus Hospice and its patients far outweighs any harm Defendant might suffer if injunctive relief is granted. The Defendant will not be harmed in any perceptible way by a simple delay in the ultimate goal he hopes to achieve through administrative procedures.

77. Because the state surveyor's Immediate Jeopardy finding was based on an inadequate investigation that mischaracterized the actual experience of the affected patients, there is a strong likelihood that Compassus Hospice will prevail on the merits in disputing the findings of the October 26, 2018 survey that resulted in the termination of Medicare provider agreement set for November 22, 2018.

78. Because Compassus Hospice has received highly limited process—including minimal opportunity to be heard and minimal opportunity for reliable factfinding—before it and its patients will be deprived of crucial property, liberty, and life interests, there is a strong likelihood that Compassus Hospice will prevail on its due process claim.

79. The injunctive relief requested by Compassus Hospice will not adversely affect the public interest. It is not in the public interest to require an unwarranted and accelerated shut down of a hospice that provides end-of-life care and treatment to 60 patients, as well as peace of mind to their families. The public interest cannot be served by shutting down Compassus Hospice based on alleged deficiencies that have not been proven true by an administrative review.

80. Based upon the irreparable harm demonstrated above, pursuant to Fed. R. Civ. P. 65, a permanent injunction should be issued enjoining Defendant from terminating Compassus Hospice's Medicare provider agreement prior to a final decision of the Secretary following all available administrative review on the merits of such termination.

81. Because Compassus Hospice and its patients will suffer irreparable harm if termination occurs while this Court considers the merits of the dispute, this Court should enter preliminary injunction preserving the status quo (and thus precluding termination) while this suit is pending. Such a preliminary injunction is also necessary to preserve this Court's jurisdiction to determine the process necessary before termination can occur.

## COUNT V
### (Issuance of Temporary Restraining Order)

82. The allegations contained in paragraphs 1 through 81 herein above are incorporated by reference as if fully set out herein.

83. Based upon the irreparable harm demonstrated above, pursuant to Fed. R. Civ. P. 65, a temporary restraining order should be issued enjoining Defendant from terminating Compassus Hospice's Medicare provider agreement until entry of a preliminary injunction.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Compassus Hospice prays that this Court:

A. Enter a temporary restraining order (ex parte or following a hearing) pursuant to Fed. R. Civ. P. 65, enjoining defendant from terminating Plaintiff's Medicare provider agreement until such time that a hearing can be held on Plaintiff's request for a preliminary injunction. Pursuant to Fed. R. Civ. P. 65, said temporary restraining order, if entered ex parte, should be made to expire at the sooner of 10 days from its entry or at the conclusion of a hearing on Plaintiff's request for a preliminary injunction;

B. Enter a preliminary injunction preserving the status quo and enjoining Defendant from terminating Compassus Hospice's Medicare provider agreement prior to a final decision in the case;

C. Enter a permanent injunction pursuant to Fed. R. Civ. P. 65 enjoining Defendant from terminating Compassus Hospice's Medicare provider agreement prior to a final decision of the Secretary following all available administrative review on the merits of such termination;

D. Declare that the Secretary's termination of Medicare funding for the care of patients of Compassus Hospice in the absence of a failure to substantially comply with applicable regulations is a violation of the Medicare Law;

E. Declare that the Secretary's termination of Compassus Hospice's Medicare Provider agreement on the basis of the state survey agency's failure to reasonably investigate and exercise due care in compliance with regulatory obligations has denied Compassus Hospice due process of law;

F. Declare that the Secretary's termination of Compassus Hospice's Medicare Provider agreement on the basis of the state survey agency's failure to reasonably investigate and exercise due care in compliance with regulatory obligations has denied Compassus Hospice's Patients due process of law; and

G. Granting such other and further relief as justice requires.

Date: November 16, 2018                                             Respectfully Submitted,


                                                                    /s/ Elizabeth B. Herrington
                                                                   Elizabeth B. Herrington
                                                                   (Bar No. 6244547IL)
                                                                   MORGAN, LEWIS & BOCKIUS LLP
                                                                   77 West Wacker Drive
                                                                   Chicago, IL 60601-5094
                                                                   T 312-324-1445 | F 312-324-1001
                                                                   Email:  beth.herrington@morganlewis.com

                                                                   Brian W. Shaffer (*pro hac vice* to be filed)
                                                                   MORGAN, LEWIS & BOCKIUS LLP
                                                                   1701 Market Street
                                                                   Philadelphia, PA 19103
                                                                   T 215-963-5103 | F 215-963-5000
                                                                   Email:  brian.shaffer@morganlewis.com

                                                                   *Attorneys for Compassus OP of Missouri LLC d/b/a Plaintiff Compassus Hospice and Palliative Care – St Louis*